'09 CIV 9110

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RICHARD G. RHOADS JR., on behalf of
himself and all others similarly situated,

     Plaintiff,

     v.

PROSHARES TRUST; PROSHARE
ADVISORS LLC; SEI INVESTMENTS
DISTRIBUTION CO.; MICHAEL L.
 SAPIR; LOUIS M. MAYBERG
RUSSELL S. REYNOLDS, III; MICHAEL
WACHS; SIMON D. COLLIER;
and DOES 1-100,

     Defendants.

Civil No.:

**RECEIVED OCT 30 2009 S.D.N.Y. CASHIERS**

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

---

Plaintiff, Richard G. Rhoads Jr., individually and on behalf of all others similarly

situated, by his attorneys, alleges the following upon information and belief, except for those

allegations as to himself, which are alleged upon personal knowledge. The allegations are based

upon counsel's investigation, a review and analysis of documents filed with the United States

Government and Securities and Exchange Commission (the "SEC"), press releases, marketing

materials and other public statements made by the Defendants, reports and interviews published

in the media and of public record, warnings issued by the SEC and other regulatory agencies and

information obtained by Plaintiff.

## NATURE OF THE ACTION

1.   This is a class action on behalf of all persons who purchased or otherwise acquired shares in the UltraShort MSCI Emerging Markets Fund offered by ProShares Trust ("ProShares EEV Fund" or the "UltraShort MSCI Fund").

2.   The UltraShort MSCI Emerging Markets Fund is a double-leveraged exchange traded fund ("ETF") offered by ProShares Trust ("ProShares" or the "Trust"), pursuant or traceable to ProShares' false and misleading Registration Statement, Prospectuses, and Statements of Additional Information (collectively, the "Registration Statement") issued in connection with the Fund's shares (the "Class"). The Class is seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

3.   ProShares has touted and solicited investment in its exotic double-leveraged EEV Fund which seeks to deliver twice the inverse (opposite) of the daily performance of the MSCI Emerging Markets Index ("MSCI").

4.   The EEV has not performed in accordance with the reasonable expectations of investors and is a defective securities product.  ProShares issued the Fund on October 30, 2007.  Its market price returns percentage for the year ending July 31, 2009 is -79.20 percent and is -54.75 percent since the Fund's inception.  The Fund traded at a 52 week high of $207.10 and currently trades at $15.85.  Its net asset value total returns percentage since inception is -54.75 percent.

5.   ETFs, regulated by the SEC under the Investment Company Act of 1940 (the "1940 Act"), are funds that track a particular stock index and trade like stock.  Non-traditional, or so-called "double-leveraged" ETFs, such as the ProShares EEV Fund, have become enormously popular over the last few years, offering investors alternate vehicles to take bullish, bearish, and

leveraged positions on popular stock indices.  The ProShares EEV double-leveraged fund has attracted increasingly significant investor assets based upon misrepresentations and material omissions of fact by the Defendants.

6.  ProShares is the fifth largest provider of ETFs in the United States, and manages approximately 99 percent of the country's leveraged ETFs. ProShares touts its double-leveraged Funds as corresponding to the performance of a benchmark such as the multiple of the price performance or the multiple inverse of the price performance of an index or security.

7.  ProShare's double-leveraged funds are essentially divided into two categories: Ultra and UltraShort. "Ultra funds" are double-long leveraged funds; whereas "UltraShort" funds are double-short leveraged funds.

8.  ProShares sells its Ultra and UltraShort ETFs as "simple" directional plays.  As marketed by ProShares, Ultra ETFs are designed to go up by a multiple of the performance of a benchmark when markets go up; UltraShort ETFs are designed to go up by a multiple of the inverse of a benchmark when markets go down.

9.  ProShares attracted investors with tempting and seemingly safe alternatives to stocks, namely ProShares Ultra ETFs and ProShares' UltraShort ETFs, including the double-leveraged EEV Fund.

10. ProShares presented their UltraShort Funds as a simple mathematical model using an objective formula to create a portfolio that will produce an inverse two times return, compared to its index.  ProShares represented that it would be "simple ... to try to hedge against downturns or seek profit when markets fall." ProShares made seeking shelter from the traditional financial markets sound easy by purchasing their UltraShort Funds.  To the contrary, ProShares mathematical model was neither accurate or simple to execute.

11. The UltraShort MSCI Emerging Markets Fund ("EEV") seeks investment results that correspond to twice the inverse (200 percent) of the daily performance of the MSCI Emerging Markets Index hereinafter ("MSCI") which was designed to measure equity market performance in global emerging markets.  The EEV Fund is mandated to take positions in securities and/or financial instruments (including derivatives) that, in combination, should have similar daily price return characteristics as 200 percent of the EEV Fund's benchmark, the MSCI Index.

12. ProShares double-leveraged fund, the EEV Fund, seeks to replicate or double the inverse return of the MSCI benchmark.

13. ProShares touts the simplicity of its formulaic model. ProShares describes its strategy as "simple" to execute. ProShare Advisors LLC ("ProShare Advisors" or the "Advisor"), which serves as the investment advisor to the EEV Fund, purports to use a straightforward mathematical approach to investing. Indeed, ProShares attributes its rapid growth to the "simplicity" its double-leveraged funds, such as the EEV Fund, bring to implementing what are represented to be straight forward investment strategies.

14. ProShares represents that its UltraShort EEV Fund operates successfully based on an objective mathematical approach. ProShares Advisors "determines the type, quantity and mix of investment positions that a[n ETF] should hold to simulate the performance of its daily benchmark," as opposed to investing assets in stocks or financial instruments based on ProShare Advisors' view of the investment merit of a particular security, instrument, or company.

15. In managing the assets of the Fund, ProShares acknowledges that it does not conduct conventional stock research or analysis, nor forecast stock market movement or trends. This strategy is marketed as not only acceptable but even desirable because the Fund offered by ProShares purports to function as a result of reliable math, not subjective criteria.

16. The problem with ProShares UltraShort MSCI Emerging Markets Fund, however, is that ProShare's math does not add up and the product does not perform.

17. For example, the EEV Fund, purchased by the Plaintiff, is supposed to deliver double the inverse return of the MSCI Index, which fell approximately 52 percent from January 2, 2008 through December 17, 2008, ostensibly creating a profit for investors who anticipated a decline in the performance of the emerging markets.  In other words, the EEV Fund should have appreciated by 104 percent during this period. However, the EEV Fund actually fell approximately 30 percent (a 134 percent shortfall) during this period.

| Anticipated Returns 1/2/08 – 12/17/08 | | Actual Returns 1/2/08 – 12/17/08 | |
|---|---|---|---|
| MSCI Index | EEV | MSCI Index | EEV |
| | 104% | | |
| -52% | | -52% | -30% |

18. Given the extreme tracking error between the performance of the EEV Fund and its benchmark index, the fact that Plaintiff and the Class sought to protect their assets by investing their monies on the correct directional play has been rendered meaningless. The EEV Fund is, therefore, the equivalent of a defective product. The EEV Fund does not do what it was designed to do, represented to do, or advertised to do.

19. The Registration Statement does not disclose that the EEV Fund is altogether defective as a directional investment play. In order to sufficiently and accurately disclose this counterintuitive reality, the Registration Statement would have to clearly explain that, notwithstanding the name of the EEV Fund, the investment objective of the EEV Fund, and the purpose of ProShares' UltraShort ETFs generally, the EEV Fund would fail to provide any reasonable correlation to its stated benchmark or investors' reasonable expectations.

20. ProShares attempts to state that the EEV Fund only seeks to replicate double the inverse return of the daily returns of the MSCI, noting that it "does not seek to achieve its stated investment objective over a period of time greater than one day." This statement, however, was insufficient to and did not inform Plaintiff and the proposed class of the material risks of investing in the EEV Fund. The Defendants failed to warn investors that holding the EEV Fund for more than a day will most certainly lead to enormous under-performance and losses. In fact, ProShares could not make that statement and still successfully issue the Fund or remain in business with respect to the EEV Fund. As ProShares certainly knows, investors do not view ETFs as day trading investment vehicles and did not day-trade the Funds. Moreover, it is virtually economically impossible for all purchasers in the EEV Fund to sell out of their positions at the end of one day or one trading session.

21. Furthermore, ProShares does not market the EEV Fund as a day-trading vehicle. In fact, ProShares' Chairman has publicly stated that investors can use ProShares' ETFs "for more than a day successfully." ProShares' Registration Statement even provides hypothetical examples of fees that investors may encounter over 1-year, 3-year, 5-year, and 10 year periods, indicating that long term investing in the ProShares double-leveraged Funds is a perfectly reasonable

investment strategy. ProShares' imposes no temporal limits on investors in its Ultra or UltraShort ETFs.

22. ProShares failed to adequately disclose that its ETFs, including its EEV Fund, are only for daily use. Even Direxion, one of ProShares' main competitors, has gone further, noting on its website that "Direxion Shares ETFs seek daily investment goals and should be used as short term trading vehicles."

23. On June 11, 2009, the Financial Industry Regulatory Authority ("FINRA") issued Regulatory Notice 09-31 (the "FINRA Notice"). The FINRA Notice cautioned that "inverse and leveraged ETFs ... typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets." FINRA reminded those who deal in non-traditional ETFs that sales materials related to leveraged and inverse ETFs "must be fair and accurate." Thereafter, FINRA spokesman Herb Perone stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products...."

24. FINRA issued additional warnings on July 13, 2009 by way of a podcast on its website. FINRA reiterated that most leveraged and inverse ETFs reset each day and are designed to achieve their stated objective on a daily basis—but with the effects of compounding over a longer time frame, results differ significantly. In spite of this admonishment and clear results to the contrary, ProShares' Chairman Michael L. Sapir maintained that ProShares' leveraged and inverse ETFs can be used "for more than a day successfully."

25. Since FINRA's warnings, some brokerage firms including Edward Jones & Co. ("Edward Jones") halted the sale of its non-traditional, leveraged ETFs, such as the EEV Fund. Edward Jones called ETFs like the EEV Fund "one of the most misunderstood and potentially dangerous types of ETFs."

26. UBS and many other firms have now also said that it would not trade ETFs that use leverage or sell an underlying asset short or long. Similarly, Raymond James, Ameriprise Financial and LPL Investment Holdings Inc. have also prohibited sales of leveraged ETFs that seek more than twice the long or short performance of their target index. Wells Fargo and Morgan Stanley Smith Barney are now also reportedly reviewing their policies on non-traditional Double-Leveraged Funds.

27. As reported on July 30, 2009 by the Wall Street Journal, Charles Schwab ("Schwab") issued an unusual warning on July 28 to clients who buy non-traditional ETFs. Schwab offered a strongly worded warning on its website noting that "while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors, it is extremely important to understand that, for holding periods longer than a day, these funds may not give you the returns you may be expecting . . . Proceed with extreme caution." The disclosures in the Registration Statement simply do not rise to this "[p]roceed with extreme caution" level of clarity.

28. Both the letter and spirit of the federal securities laws call for complete and unrestricted disclosure of material facts. Here, prospective and actual investors in each of the Funds have been deceived by the notion of directional investment plays. It is readily apparent that ProShares has violated the spirit and purpose of the registration requirements of the Securities Act: "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." ProShares lured investors with a false predicate—that the UltraShort MSCI Emerging Markets Fund would go up if the MSCI went down. The registration provisions are designed not only to protect immediate recipients of distributed securities but also subsequent purchasers from them.

29. The EEV Fund is not a simple investment vehicle, did not go up when its benchmark index went down, and investors in the EEV Fund have been shocked to learn that their supposedly safe hedge has caused them substantial losses. This action alleges that Defendants failed to disclose, *inter alia*, the following risks in the Registration Statement:

a. Mathematical compounding actually prevents the EEV Fund from achieving its stated investment objective over a period of time greater than one day;

b. Once an index falls and the UltraShort Fund moves in the opposite direction, they no longer share their original mathematical relationship;

c. Wide divergence and/or inverse correlation between the EEV Fund and the MSCI over time would only happen in the rarest of circumstances, and inadvertently if at all;

d. The extent to which performance of the EEV Fund would inevitably diverge from the performance of the MSCI —i.e., the probability, if not certainty, of spectacular tracking error;

e. The severe consequences of high market volatility on the EEV Fund's investment objective and performance;

f. The severe consequences of inherent path dependency in periods of high market volatility on the EEV Fund's performance;

g. The role the EEV Fund plays in increasing market volatility, particularly in the last hour of trading;

h. The consequences of the EEV Fund's daily hedge adjustment always going in the same direction as the movement of the underlying index, notwithstanding that it is an inverse leveraged ETF;

    i.   The EEV Fund causes dislocations in the stock market;

    j.   The EEV Fund offers a seemingly straightforward way to obtain desired

        exposure, but such exposure is not attainable through the EEV Fund.

## JURISDICTION AND VENUE

30. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).

31. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act.

32. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District.

33. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

34. Plaintiff, Richard G. Rhoads Jr. is a resident of the State of North Carolina, invested assets in the EEV Fund and was damaged thereby, as detailed in the Certification attached hereto as Exhibit A.

35. Defendant ProShares Trust ("ProShares"), located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, is a Delaware statutory trust organized on May 29, 2002. ProShares Trust is registered with the SEC as an open-end management investment company under the 1940 Act. ProShares has a series of ETFs, the shares of which are all listed on the American Stock Exchange. Each ProShares ETF has its own CUSIP number and exchange trading symbol. Each ProShares ETF issues and redeems Shares on a continuous basis at net

asset value ("NAV") in large, specified numbers of Shares called "Creation Units." For each

ETF, a Creation Unit is comprised of 75,000 shares. In 2008, ProShares ranked second among all

U.S. ETF companies in year-to-date net flows. ProShares now manages over $20 billion,

accounting for 99 percent of the country's short and leveraged ETFs.

36. Defendant ProShare Advisors LLC ("ProShare Advisors"), located at 7501 Wisconsin

Avenue, Suite 1000, Bethesda, Maryland 20814, serves as the investment advisor to the EEV

Fund. ProShare Advisors provides investment advice and management services to ProShares and

its ETFs, including the EEV Fund.  ProShare Advisors oversees the investment and reinvestment

of the assets in the EEV Fund and other Funds. ProShare Advisors is owned by Defendants

Michael L. Sapir, Louis M. Mayberg and William E. Seale.

37. Defendant SEI Investments Distribution Co. ("SEI"), located at 1 Freedom Valley Drive,

Oaks, PA 19456, is the distributor and principal underwriter for the Funds. SEI has been

registered with the SEC and FINRA since 1982. SEI was hired by ProShares to distribute shares

of the Funds to broker/dealers and, ultimately, shareholders.

38. Defendant Michael L. Sapir ("Sapir"), an Interested Trustee of ProShares, has been the

Chairman and Chief Executive Officer of ProShare Advisors since its inception. Sapir signed the

Registration Statement.

39. Defendant Louis M. Mayberg ("Mayberg") has been President of ProShare Advisors

since inception. Mayberg signed the Registration Statement.

40. Defendant Russell S. Reynolds, III ("Reynolds") is a Non-Interested Trustee of ProShares

who signed the Registration Statement.

41. Defendant Michael Wachs ("Wachs") is a Non-Interested Trustee of ProShares who

signed the Registration Statement.

42. Defendant Simon D. Collier ("Collier") has been ProShares' Treasurer since June 2006. In his capacity as Treasurer, Collier signed the Registration Statement.

43. The Defendants enumerated in Paragraphs 38-42 are hereinafter referred to as the "Individual Defendants." The Individual Defendants, in their respective roles, ultimately control the operations of the Funds. The Board of Trustees of ProShares is responsible for the general supervision of all of the Funds. The officers of ProShares are responsible for the day-to-day operations of the Funds.

### CLASS ACTION ALLEGATIONS

44. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of the EEV double-leveraged funds pursuant or traceable to the Company's false and misleading Registration Statement and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

45. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

46. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

48. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a.  whether the Securities Act was violated by Defendants' acts as alleged herein;

   b.  whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations and/or management of ProShares; and

   c.  to what extent the members of the Class have sustained damages and the proper measure of damages.

49. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

**A.    Traditional ETFs**

50. ETFs are investment companies that are legally classified as open-end companies or Unit Investment Trusts. ETFs are frequently considered low cost index mutual funds that trade like stocks. ETFs, however, differ from traditional mutual funds in the following ways:

a.    ETFs do not sell individual shares directly to investors and only issue shares in large blocks (of 50,000 shares, for example) that are known as "Creation Units";

b.    Investors generally do not purchase Creation Units with cash. Instead, investors buy Creation Units with a basket of securities that generally mirrors an ETF portfolio;

c.    After purchasing a Creation Unit, an investor often splits it up and sells the individual shares on a secondary market. This permits other investors to purchase individual shares (instead of Creation Units); and

d.    Investors who want to sell their ETF shares have two options: (1) they can sell individual shares to other investors on the secondary market, or (2) they can sell the Creation Units back to the ETF. ETFs generally redeem Creation Units by giving investors the securities that comprise the portfolio instead of cash.

**B.    ProShares Non-Traditional or Double-Leveraged ETFs Such As The EEV Fund**

51. ProShares non-traditional, double-leveraged ETFs such as the EEV Fund are an even newer breed of exotic ETFs that claim to deliver multiples of the performance or inverse returns of the index or benchmark they track.

52. The non-traditional ProShares ETF, the EEV Fund, is both short and double-leveraged, meaning that it seeks to achieve a return that is a twice the inverse performance of the underlying index.  To accomplish their objectives, ProShares pursues a range of investment strategies through the use of complex swaps, futures contracts and other derivative instruments.

53. ProShares EEV Fund "resets" daily. This results in major "compounding" effects. Using a two-day example, if the index goes from 100 to close at 101 on the first day and back down to close at 100 on the next day, the two-day return of an inverse ETF will be different than if the index had moved up to close at 110 the first day but then back down to close at 100 on the next day. In the first case with low volatility, the inverse ETF loses 0.02 percent; but, in the more volatile scenario, the inverse ETF loses 1.82 percent.

ADDITIONAL FACTUAL ALLEGATIONS

**A.      ProShares' Non-Traditional UltraShort EEV Fund**

54.      ProShares describes its UltraShort ETFs as vehicles that "[seek profit from downturns]." ProShares' UltraShort ETFs "provide a simple way to try to seek profit from a market segment that you think is poised to fall."

55.      On its website, ProShares provides the following "Q&A" regarding its UltraShort ETFs, in relevant part:

> Q: What are Short ProShares?
>
> A: They are the first exchange traded funds (ETFs) specifically designed to go up when markets go down. Short ProShares are built to move in the opposite direction of the markets.
>
> Here's how they work: if the S&P 500® Index drops 1 percent in a day, ProShares Short S&P500® should gain 1 percent that day (before fees and expenses). UltraShort ProShares double the effect. ProShares UltraShort S&P500® should gain 2 percent (before fees and expenses) if the index slips 1 percent in a day.
>
> On the flip side, Short ProShares will lose value if markets rise. If the S&P 500 gains 1 percent in a day, ProShares Short S&P500 should lose 1 percent, and ProShares UltraShort S&P500 should lose 2 percent (again, before fees and expenses). UltraShort ProShares make it simple for you to execute sophisticated strategies designed to manage risk or enhance return potential.
>
> Q: How are Short ProShares different from short selling?
>
> A: Short selling a stock or ETF requires a margin account. Short ProShares don't. They allow you to get short exposure without the hassles—or expense—of a margin account. It's as simple as buying a stock.
>
> Accordingly, ProShares represents that its "short" ETFs are specifically designed to "go up when markets go down," and are "built to move in the opposite direction of the markets." ProShares' places no temporal limits on investors in its UltraShort ETFs.

56. If a class member owns a ProShares UltraShort fund designed to rise by twice as much as its underlying index falls on any given day, holding the fund for more than one day and the longer the trading continues, the greater the divergence from the ProShares promised 2-to-1 results become, as demonstrated below:

|  | DAY ONE | | | DAY TWO | | |
|---|---|---|---|---|---|---|
|  | Starting Value | Daily % Change | Ending Value | Daily % Change | Ending Value | % Change from Start |
| INDEX | $100.00 | 10.0% | $110.00 | -9.0% | $100.10 | 0.1% |
| FUND | $10.00 | -20.0% | $8.00 | 18.0% | $9.44 | -5.6% |

57. By the end of day two, although the index is slightly above 100, to fulfill an investor's reasonable expectations, the fund would also have to be back near its starting point. Instead however, from a simple mathematical standpoint, the fund has fallen 5.6 percent in value to $9.44 and the longer the trading continues, the greater divergence from ProShares promised 2-to-1 result.

**B.    The EEV Fund**

58. On or about October 30, 2007, ProShares registered the EEV Fund as an ETF. The EEV Fund seeks investment results, before fees and expenses that correspond to twice the inverse daily performance of the MSCI. The MSCI is a float-adjusted capitalization-weighted index that targets for index inclusion 85 percent of free float adjusted market capitalization in each industry group, in global emerging market countries.

59. The EEV Fund takes positions in securities and/or financial instruments that, in combination, should have similar return characteristics as —200 percent of the return of the index. The EEV Fund's principal investment strategies include:

a. Taking positions in financial instruments (including derivatives) that Pro Share Advisors believes, in combination, should have similar daily price return characteristics as twice (200 percent) the inverse of the MSCI;

b. Committing at least 85 percent of its assets to investments that, in combination, have economic characteristics that are inverse to those of the MSCI;

c. Employing leveraged investment techniques in seeking its investment objective;

d. Investing assets not invested in financial instruments in debt securities and/or money market instruments; and

e. Concentrating investments in a particular industry or group of industries to approximately the same extent as the Index is so concentrated.

60. Investors who acquired shares in the EEV Fund during the Class Period thought they were protecting their assets. Indeed, the MSCI was down by 52 percent in 2008. However, instead of increasing 104 percent in value as the MSCI declined, the value of the EEV Fund actually fell 30 percent (a 134 percent short fall), causing Plaintiff and the Class losses even though, directionally speaking, they invested correctly.

61. The EEV Fund is supposed to deliver double the inverse return of the MSCI, which fell 52 percent from January 2, 2008 through December 17, 2008, ostensibly creating a profit (or an offset against other losses) for investors who anticipated a decline in the emerging markets.

62. Given this dramatic tracking error, the fact that Plaintiff and the Class invested their monies on the correct directional play has been rendered meaningless. The Fund is, therefore, the

equivalent of a defective product. The Fund does not do what it was designed to do, represented to do, or advertised to do. It does not perform in accordance with reasonable expectations of investors.

63. The Registration Statement does not disclose that the EEV Fund is altogether defective as a directional investment play. In order to sufficiently and accurately disclose this counterintuitive reality, the Registration Statement would have to clearly explain that, notwithstanding the name of the EEV Fund, the investment objective of the EEV Fund, and the purpose of ProShares' UltraShort ETFs generally, the EEV Fund would perform precisely the opposite of investors' reasonable expectations.

64. The Registration Statements do not disclose, or fail to emphasize, that these funds must be sold within one (1) day. In other words, investors are not aware that the only chance they have, within any mathematical formula, to profit is by selling the same day they buy into the fund.

65. ProShares cavalierly states that the EEV Fund seeks to replicate double the inverse return of the daily returns of the MSCI, noting that it "does not seek to achieve its stated investment objective over a period of time greater than one day." Of course, this statement does not warn that holding the EEV Fund for more than a day will lead to enormous losses. As ProShares knows, investors did not view ETFs as day trading investment vehicles and did not day trade the EEV Fund or the other ProShares Funds. In fact, it is virtually economically impossible for all ProShares EEV Fund and other Funds' purchasers to sell out of their positions at the end of one day.

66. Furthermore, ProShares does not market the EEV Fund or the other Funds referenced in paragraph one as day-trading vehicles. In fact, ProShares' Chairman has publicly stated that

investors can use ETFs "for more than a day successfully." ProShares' Registration Statement even provides hypothetical examples of fees that investors may encounter over 1-year, 3-year, 5-year, and 10-year periods. There are no temporal limits placed on investors in the EEV Fund.

67. ProShares now acknowledges on its website that "because of the daily objective of leveraged and inverse funds, investors should monitor their performance, as frequently as daily." ProShares, however, stopped short of disclosing that its ETFs are for short-term use only. Even Direxion, one of ProShares' main competitors, has gone further. On its website, Direxion notes that its ETFs "should be used as short term trading vehicles."

C.    **The False and Misleading Registration Statement**

68. On August 30, 2006, ProShares filed a Registration Statement with the SEC on Form N1-A, which incorporates by reference ProShares' prospectuses dated January 23, 2007, and October 1, 2008, as supplemented on December 1, 2008, January 15, 2009, April 7, 2009, and May 26, 2009, as well as ProShares Annual and Semi-Annual reports, and Statements of Additional Information (collectively, the "Registration Statement"). The Registration Statement was signed by the Individual Defendants.

69.    Primarily with respect to leverage, compounding, and volatility risks, the August 30, 2006 Form N1-A disclosed:  The ProShares employs leveraged investment techniques to achieve its investment objective. Over time, the use of leverage, combined with the effect of compounding, will have a more significant impact on the Fund's performance compared to the index underlying its benchmark than a fund that does not employ leverage. Therefore, the return of the index over a period of time greater than one day multiplied by a fund's specified multiple or inverse multiple (e.g., 200 percent or -200 percent) will not generally equal a fund's performance over that same period.  ProShares seeks to achieve a multiple of an index and

therefore will experience greater volatility than the index underlying its benchmark and consequently has the potential for greater losses.

70.    The disclosures and representations made by the Defendants in the Registration Statement and Prospectus were false and/or misleading because they failed to disclose:

a. Mathematical compounding actually prevents the EEV Fund from achieving its stated investment objective over a period of time greater than one day;

b. Once the MSCI index falls and the UltraShort EEV Fund moves in the opposite direction, they no longer share their original mathematical relationship;

c. Inverse correlation between the EEV Fund and the MSCI over time would only happen in the rarest of circumstances, and inadvertently if at all;

d. The extent to which performance of the EEV Fund would inevitably diverge from the performance of the MSCI—i.e., the probability, if not certainty, of spectacular tracking error;

e. The severe consequences of high market volatility on the EEV Fund's investment objective and performance;

f. The severe consequences of inherent path dependency in periods of high market volatility on the EEV Fund's performance;

g. The role the EEV Fund plays in increasing market volatility, particularly in the last hour of trading;

h. The consequences of the EEV Fund's daily hedge adjustment always going in the same direction as the movement of the underlying index, notwithstanding that it is an inverse leveraged ETF;

i. The EEV Fund causes dislocations in the stock market;

j.   The EEV Fund offers a seemingly straightforward way to obtain desired

exposure, but such exposure is not attainable through the EEV Fund.

71. Perhaps most importantly, ProShares failed to disclose that mathematical compounding

actually prevents the EEV Fund from achieving its stated investment objective over a period of

time greater than one day. ProShares' affiliate, ProShares Trust 115, disclosed this material fact

in a Form 10-K filed with the SEC on March 31, 2009 ("The Funds do not seek to achieve their

stated investment objective over a period of time greater than one day because mathematical

compounding prevents the Funds from achieving such results.").

72. Disclosures that merely state the return of the index over a period of time greater than one

day multiplied by a fund's specified multiple or inverse multiple "may" or "will not generally"

equal a fund's performance over that same period are misleading given the virtual impossibility

of the EEV Fund's ability to correlate to the MSCI over time.

73. ProShares Trust II is a Delaware statutory trust formed on October 9, 2007, and is a

commodity pool as defined in the Commodity Exchange Act. ProShares Trust II is currently

organized into separate series of ETFs, just like ProShares. ProShares Trust II employs the same

purportedly formulaic model as ProShares.

74. By its very construct, the EEV Fund actually exacerbates volatility, thus directly

contributing to its  own failure as an instrument for anything other than a day trade. By

bifurcating an index into long side and short side ETFs, ProShares eliminates an "out" for the

market maker, causing the market maker to actively hedge in the underliers. With a normal

security, all buyers and sellers come to a central meeting place, and buyers can be matched easily

with sellers, and price discovery is reached. However, when you set up a specifically double-

leveraged instrument, rather than one common product that people can be either long or short on,

an ETF contributes to dislocations. Moreover, ProShares purposefully segments the Ultra and UltraShorts, and that, by definition, creates illiquidity. ProShares failed to sufficiently disclose as much to Plaintiff and the Class.

75. ProShares' feeble attempt to explain the relationship between compounding and volatility vis-a-viz an acknowledgment that "periods of higher index volatility will cause the effect of compounding to be more pronounced"—does not at all explain to investors that: (a) volatility erodes returns and wealth accumulation, a fact not commonly understood; (b) the path that returns take over time has important effects on mid- and long-term total return achieved; and (c) the return-volatility relationship matters even more so where leverage is employed. In short, with a double leveraged ETF such as the EEV Fund, investors receive at least twice the risk of the index but less than twice the return. The drag imposed by return volatility makes such a result inevitable. Clearly, this is not a desirable outcome for investors.

76. Prospective and actual investors in ProShares have been misled. The EEV Fund is not a "simple" kind of investment. ProShares has violated the spirit and purpose of the registration requirements of the Securities Act, which are "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions."  The registration provisions are designed not only to protect immediate recipients of distributed securities but also subsequent purchasers from them. Double-leveraged ETFs, such as the EEV Fund, do not constitute a suitable or solid investment or hedging strategy for investors who intend to hold their positions for longer than one day. ProShares failed to disclose these material facts to Plaintiff and the Class.

**D.**    **Red Flags Raised by FINRA & Others**

77. In June 2009, FINRA issued Regulatory Notice 09-31, in which FINRA "remind[ed]

firms of their sales practice obligations in connection with leveraged and inverse ETFs." In

particular, FINRA admonished that sales materials related to leveraged and inverse ETFs "must

be fair and accurate." FINRA further cautioned:

> **Suitability**
> NASD Rule 2310 requires that, before recommending the purchase, sale or
> exchange of a security, a firm must have a reasonable basis for believing that
> the transaction is suitable for the customer to whom the recommendation is
> made. This analysis has two components. The first is determining whether the
> product is suitable for any customer, an analysis that requires firms and
> associated persons to fully understand the products and transactions they
> recommend.
>
> **Communications With the Public**
> NASD Rule 2210 prohibits firms and registered representatives from making
> false, exaggerated, unwarranted or misleading statements or claims in
> communications with the public. Therefore, all sales materials and oral
> presentations used by firms regarding leveraged and inverse ETFs must
> present a fair and balanced picture of both the risks and benefits of the funds,
> and may not omit any material fact or qualification that would cause such a
> communication to be misleading....

78. FINRA spokesman Herb Perone has stated: "Exotic ETFs, such as inverse, leveraged and

inverse-leveraged ETFs, are extremely complicated and confusing products, and the marketing

and sale of these products to unsophisticated retail investors is very much on FINRA's radar

screen."

79. FINRA issued additional guidance on July 13, 2009 by way of a podcast on its website.

FINRA reiterated that most leveraged and inverse ETFs reset each day and are designed to

achieve their stated objective on a daily basis—but with the effects of compounding over a

longer time frame, results differ significantly. In spite of this admonishment, Defendant Sapir

maintains that ProShares' leveraged and inverse ETFs can be used "for more than a day successfully."

80. On July 15, 2009, Massachusetts' Secretary of State William Galvin announced that Massachusetts had begun a probe into the sales practices of ProShares, among other firms heavily involved in structuring leveraged ETFs. Galvin stated: "[s]ince 2006 these products have become increasingly popular. Yet, due to the daily nature of the leverage employed, there is no guarantee of amplified annual returns and they generally incur greater transaction costs than traditional exchange traded funds."

81. On July 21, 2009, as reported by the Wall Street Journal in an article entitled "Getting Personal, Edward Jones Drops ETFs," Edward Jones & Co. ("Edward Jones") halted the sale of its non-traditional, leveraged ETFs, such as the EEV Fund. Edward Jones called ETFs like the EEV Fund "one of the most misunderstood and potentially dangerous types of ETFs."

82. On July 27, 2009, in a letter to wealth management clients, as reported by the Wall Street Journal in an article entitled "Strange Traded Funds," UBS said it would not trade ETFs that use leverage or sell an underlying asset short. Similarly, on the heels of the FINRA Notice, Ameriprise Financial and LPL Investment Holdings Inc. have also prohibited sales of leveraged ETFs that seek more than twice the long or short performance of their target index. Wells Fargo is now also reportedly reviewing its policy on non-traditional ETFs.

83. On July 30, 2009, the Wall Street Journal published an article entitled "Warning Signs Up For Leveraged ETFs," in which it was reported that Morgan Stanley Smith Barney is reviewing how it sells leveraged ETFs. The article also observed that Charles Schwab ("Schwab") issued an unusual warning on July 28 to clients who buy non-traditional ETFs. Schwab offered a strongly worded warning on its website noting that "while there may be limited

occasions where a leveraged or inverse ETF may be useful for some types of investors, it is extremely important to understand that, for holding periods longer than a day, these funds may not give you the returns you may be expecting.... Proceed with extreme caution."  The disclosures in the Registration Statement simply do not rise to this "[p]roceed with extreme caution" level of clarity.

84. On August 1, 2009, the Wall Street Journal quoted Morningstar's director of ETF analysis, Scott Burns, who recently poignantly observed: "Hedges [like the EEV Fund] aren't supposed to become less trustworthy when you really need them."

## COUNT I

### VIOLATIONS OF § 11 OF THE 1933 ACT AGAINST ALL DEFENDANTS

85. This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

86. Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against all defendants.

87. ProShares is the issuer of the shares in the UltraShort MSCI Emerging Markets Fund and sold via the Registration Statement. The Individual Defendants are signatories or authorizers of the Registration Statement.

88. ProShares is absolutely liable for the material misstatements in and omissions from the Registration Statement. The other Defendants owed purchasers of the stock the duty to make a reasonable investigation of the statements contained in the Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. These Defendants knew or, in the exercise of reasonable care, should have known of the material misstatements and

omissions contained in the Registration Statement as set forth herein. None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that statements contained in the Registration Statement and Prospectus were true or that there was not any omission of material fact necessary to make the statements made therein not misleading.

89. As signatories or authorizers of the Registration Statement, directors, officers of the EEV Fund or controlling persons of the issuer, the Defendants owed the purchasers of EEV shares, including Plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time that it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Registration Statement and Prospectus as set forth herein. As such, Defendants are liable to Plaintiff and the Class.

90. By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act. As a direct and proximate result of Defendants' wrongful conduct, the market price for EEV shares was artificially inflated, and Plaintiff and the Class suffered substantial damages in connection with the purchase thereof. Plaintiff and the Class all purchased EEV stock or shares in the EEV Fund issued pursuant and/or traceable to the Registration Statement.

91. Plaintiff and other members of the Class purchased or otherwise acquired their EEV shares or shares in the ProShares Funds without knowledge of the untruths or omissions alleged herein. Plaintiff and the other members of the Class were thus damaged by Defendants' misconduct and by the material misstatements and omissions in the Registration Statement.

92. At the time of their purchases of their shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

## COUNT II

### VIOLATIONS OF § 15 OF THE SECURITIES ACT AGAINST THE INDIVIDUAL DEFENDANTS

93. Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against the Individual Defendants.

94. Each of the Individual Defendants named herein acted as a controlling person of the Company within the meaning of Section 15 of the Securities Act. The Individual Defendants were each trustees or officers and/or directors of ProShares charged within the legal responsibility of overseeing its operations. Each controlling person had the power to influence and exercised the same to cause his controlled person to engage in the unlawful acts and conduct complained of herein.

95. By reason of such conduct, the Defendants named in this Count are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the EEV Fund.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as a class

representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class

Members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees;

D.      Awarding damages in the form of rescission; and

E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  October 30, 2009                            Respectfully submitted,
                                                   The Plaintiff, Richard G. Rhoads
                                                   By his attorneys,


                                                   David A.P. Brower
                                                   **BROWER PIVEN**
                                                    A PROFESSIONAL CORPORATION
                                                   488 Madison Avenue
                                                   Eighth Floor
                                                   New York, New York 10022
                                                   Tel: (212) 501-9000
                                                   Fax: (212) 501-0300
                                                   Email: brower@browerpiven.com

                                                   Kenneth G. Gilman, Esq.
                                                   GILMAN AND PASTOR, LLP
                                                   16 Fourteenth Avenue
                                                   Wareham, Mass. 02571
                                                   T: (508) 291-8400
                                                   F: (508) 291-3258
                                                   Email: kgilman@gilmanpastor.com

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Richard G. Rhoads, Jr., hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification. I have reviewed the complaint prepared against the UltraShort EEV ProShares Fund alleging violations of the federal securities laws and I authorized the filing of this complaint;

2.      I did not purchase the UltraShort EEV ProShares Fund at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      I am willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.      I have transactions in the UltraShort EEV ProShares Fund during the class period as reflected in Exhibit A hereto;

5.      I have not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except for the following: none

6.      Beyond my pro rata share of any recovery, I will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Executed this __31__ day of August, 2009.                    Richard G. Rhoads, Jr.

**Exhibit A**

| Trade Date | Name of Fund | Type of Trade | # of Shares | Price |
|---|---|---|---|---|
| 10/22/2008 | EEV | Bought | 1300 | $142.88 |
| 10/22/2008 | EEV | Bought | 75 | $144.49 |
| 10/23/2008 | EEV | Sold | -788 | $149.96 |
| 10/23/2008 | EEV | Sold | -212 | $149.99 |
| 10/23/2008 | EEV | Sold | -100 | $149.97 |
| 10/23/2008 | EEV | Sold | -100 | $149.96 |
| 10/23/2008 | EEV | Sold | -100 | $149.89 |
| 10/23/2008 | EEV | Sold | -75 | $149.56 |
| 10/24/2008 | EEV | Sold | -530 | $177.30 |
| 10/24/2008 | EEV | Sold | -200 | $176.79 |
| 10/24/2008 | EEV | Sold | -200 | $175.51 |
| 10/24/2008 | EEV | Sold | -20 | $176.58 |
| 10/24/2008 | EEV | Bought | 100 | $192.19 |
| 10/24/2008 | EEV | Bought | 100 | $192.41 |
| 10/24/2008 | EEV | Bought | 100 | $192.42 |
| 10/24/2008 | EEV | Bought | 100 | $192.43 |
| 10/24/2008 | EEV | Bought | 150 | $192.39 |
| 10/24/2008 | EEV | Bought | 200 | $192.38 |
| 10/24/2008 | EEV | Bought | 200 | $192.46 |
| 10/24/2008 | EEV | Bought | 950 | $175.00 |
| 10/24/2008 | EEV | Bought | 59 | $178.88 |
| 10/27/2008 | EEV | Sold | -100 | $194.00 |
| 11/11/2008 | EEV | Bought | 4 | $92.88 |
| 11/21/2008 | EEV | Bought | 20 | $114.16 |
| 11/24/2008 | EEV | Sold | -34 | $88.24 |
| 11/24/2008 | EEV | Sold | -29 | $88.23 |
| 12/1/2008 | EEV | Bought | 100 | $81.73 |
| 12/1/2008 | EEV | Bought | 350 | $81.71 |
| 12/31/2008 | EEV | Sold | -187 | $53.66 |
| 1/15/2009 | EEV | Sold | -1133 | $58.94 |
| 1/22/2009 | EEV | Sold | -153 | $64.81 |
| 1/22/2009 | EEV | Bought | 53 | $64.82 |
| 1/22/2009 | EEV | Bought | 100 | $64.45 |

JS 44C/SDNY
REV. 1/2008

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS**

RICHARD G. RHOADS JR.

**DEFENDANTS**

PROSHARES TRUST, et al.

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

David A.P. Brower
BROWER PIVEN, A Professional Corporation
488 Madison Avenue, 8th Floor, New York, NY 10022

**ATTORNEYS (IF KNOWN)**

Robert A. Skinner
ROPES & GRAY LLP
One International Place, Boston, Massachusetts 02110

**CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Sections 11 and 15 of the Securities Act of 1933

Has this or a similar case been previously filed in SDNY at any time? No? [ ] Yes? [✓] Judge Previously Assigned John G. Koeltl

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [✓] Yes [ ] If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*          NATURE OF SUIT

| CONTRACT | TORTS PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 610 AGRICULTURE | [ ] 422 APPEAL 28 USC 158 | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 620 OTHER FOOD & DRUG | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 410 ANTITRUST |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | | [ ] 430 BANKS & BANKING |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | | [ ] 630 LIQUOR LAWS | PROPERTY RIGHTS | [ ] 450 COMMERCE |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | PERSONAL PROPERTY | [ ] 640 RR & TRUCK | [ ] 820 COPYRIGHTS | [ ] 460 DEPORTATION |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT LIABILITY | [ ] 370 OTHER FRAUD | [ ] 650 AIRLINE REGS | [ ] 830 PATENT | [ ] 470 RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | [ ] 660 OCCUPATIONAL SAFETY/HEALTH | [ ] 840 TRADEMARK | |
| | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | [ ] 690 OTHER | SOCIAL SECURITY | [ ] 480 CONSUMER CREDIT |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | | [ ] 861 HIA (1395ff) | [ ] 490 CABLE/SATELLITE TV |
| | | | LABOR | [ ] 862 BLACK LUNG (923) | [ ] 810 SELECTIVE SERVICE |
| [ ] 160 STOCKHOLDERS SUITS | | | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 863 DIWC/DIWW (405(g)) | [X] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 190 OTHER CONTRACT | | | [ ] 720 LABOR/MGMT RELATIONS | [ ] 864 SSID TITLE XVI | [ ] 875 CUSTOMER CHALLENGE 12 USC 3410 |
| [ ] 195 CONTRACT PRODUCT LIABILITY | | | [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT | [ ] 865 RSI (405(g)) | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 196 FRANCHISE | ACTIONS UNDER STATUTES | | [ ] 740 RAILWAY LABOR ACT | FEDERAL TAX SUITS | [ ] 891 AGRICULTURAL ACTS |
| | CIVIL RIGHTS | PRISONER PETITIONS | [ ] 790 OTHER LABOR LITIGATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 892 ECONOMIC STABILIZATION ACT |
| | [ ] 441 VOTING | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 791 EMPL RET INC SECURITY ACT | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 893 ENVIRONMENTAL MATTERS |
| REAL PROPERTY | [ ] 442 EMPLOYMENT | | | | [ ] 894 ENERGY ALLOCATION ACT |
| [ ] 210 LAND CONDEMNATION | [ ] 443 HOUSING/ ACCOMMODATIONS | [ ] 530 HABEAS CORPUS | IMMIGRATION | | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 220 FORECLOSURE | [ ] 444 WELFARE | [ ] 535 DEATH PENALTY | | | [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE |
| [ ] 230 RENT LEASE & EJECTMENT | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 540 MANDAMUS & OTHER | [ ] 462 NATURALIZATION APPLICATION | | |
| [ ] 240 TORTS TO LAND | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 550 CIVIL RIGHTS | [ ] 463 HABEAS CORPUS- ALIEN DETAINEE | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 440 OTHER CIVIL RIGHTS | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION ACTIONS | | |
| [ ] 290 ALL OTHER REAL PROPERTY | | | | | |

*Check if demanded in complaint:*

[X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [✓] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

JUDGE John G. Koeltl          DOCKET NUMBER 09-cv-07356

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

| (PLACE AN x IN ONE BOX ONLY) | | ORIGIN | | | | |
|---|---|---|---|---|---|---|
| [x] 1 Original Proceeding | [ ] 2a. Removed from State Court [ ] 2b. Removed from State Court AND at least one party is pro se. | [ ] 3 Remanded from Appellate Court | [ ] 4 Reinstated or Reopened | [ ] 5 Transferred from (Specify District) | [ ] 6 Multidistrict Litigation | [ ] 7 Appeal to District Judge from Magistrate Judge Judgment |

| (PLACE AN x IN ONE BOX ONLY) | BASIS OF JURISDICTION | IF DIVERSITY, INDICATE |
|---|---|---|
| [ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT | [x] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [ ] 4 DIVERSITY | CITIZENSHIP BELOW. (28 USC 1322, 1441) |

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF DEF | | PTF DEF | | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 [ ]5 |
| CITIZEN OF ANOTHER STATE | [ ]2 [ ]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 [ ]4 | FOREIGN NATION | [ ]6 [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

RICHARD G. RHOADS JR.
608 Austin Avenue
Cary, NC 27511

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

PROSHARES TRUST; PROSHARE ADVISORS LLC; MICHAEL L. SAPIR; LOUIS M. MAYBERG; RUSSELL S. REYNOLDS, III; MICHAEL WACHS; SIMON D. COLLIER - 7501 Wisconsin Avenue, Suite 1000, Bethesda, MD 20814

SEI INVESTMENTS DISTRIBUTION CO. - 1 Freedom Valley Drive, Oaks, PA 19456

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] MANHATTAN
(DO NOT check either box if this a PRISONER PETITION.)

DATE 10/30/09    SIGNATURE OF ATTORNEY OF RECORD

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[ ] YES (DATE ADMITTED Mo. 02 Yr. 1984 )
Attorney Bar Code # DB-4923

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J. Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)